[Civ. No. 6774. Third Dist. May 29, 1943.]

EDWARD E. TUMAN, Respondent, v. F. H. BROWN et al., Defendants; ALBERT J. RUPLEY, Appellant.

18

Lyon & Roberts and Henry S. Lyon for Appellant.

Thomas Maul, Richard Barry and C. W. Pearson for Respondent.

PEEK, J.—This is an appeal from an award in favor of plaintiff Edward E. Tuman and against the defendants F. R. Brown and Albert J. Rupley. The defendant Rupley alone appeals from the judgment. Three separate actions as well as attachments and third party claims were filed involving the parties to the present suit, which proceedings were consolidated at the time of trial, and as a consequence the record is somewhat involved. Also the record is indefinite as regards the early history of the present controversy. However, appellant states that it is of no importance for it is only of slight consequence to this appeal, but respondent, to the contrary, believes that it is, and it is from his brief that we find the only information concerning those facts which help to provide the background of the present litigation.

The respondent, in his brief, states that originally a controversy arose between Rupley, the appellant herein, and George and Edward Tuman, father and son respectively, concerning George's operation of his sawmill. As a result of the discord Rupley filed an action against Edward and attached certain lumber at his planing mill which Rupley claimed he had sold to Edward. That attachment is one of the two involved in the present appeal. George filed a third party claim to the lumber alleging that it had been delivered on consignment to his son Edward. At the hearing of George's third party claim the trial court found that both George and Rupley were wrong, that it did not belong to Rupley nor was it on consignment to Edward, but in fact it had been sold outright to Edward. Thereafter another third party claim and further law suits were filed. When Rupley filed the original action he also made a request for a keeper. Unfortunately the sheriff placed one of the litigants, F. H. Brown, in charge. Brown had been the former owner of the

planing mill site and of the equipment in the mill, but prior to any of the litigation herein he leased the premises to Edward and sold him all of the equipment. Shortly after Brown assumed his duties as keeper he intervened in Rupley's action with the filing of a third party claim, by which he claimed all of the equipment in Edward's mill. He also filed an action to declare a breach of his agreement with Edward, alleging numerous irregularities in Edward's conduct of his business and defaults under the terms of the agreement. This action, according to what we have been able to discover in the record, did not come to light until shortly before the trial.

Chaotic is probably a proper adjective to describe mildly the ultimate conditions which resulted from the filing of Brown's third party claim. The sheriff did not serve written notice upon Rupley in accordance with section 689 of the Code of Civil Procedure but orally informed Rupley's attorney that Brown had filed a third party claim. Nor was any written notice ever served in accordance with said section. Edward had no knowledge of these matters until some time later. No action was taken by anyone to remove Brown as keeper. The sheriff testified that Brown remained in that capacity and that he so continued until the premises were destroyed by fire.

Following the fire Edward, apparently provoked with the turn of events or tired of always being so consistently on the defensive, took the offensive and filed an action against both Brown and Rupley to recover damages for the value of the mill and the lumber and for the loss of profits. Edward alleged in his complaint that Rupley and Brown had conspired to convert to their own use his mill, his lumber and his business, that they had operated the mill and sold the lumber, and that by reason of their negligence in the operation of the mill the remaining lumber was destroyed.

At the conclusion of the trial the court awarded damages against the defendants in the sum of $7,267.06, which was the total of the following amounts: $1,900 for the loss of the planing mill, $4,867.06 for lumber and materials, and $500 for loss of profits.

The appellant now contends in this appeal that when he failed to file a bond against the third party claim of Brown that the attachment was automatically released. That even

though the attachment was not released and was in force he, as the attaching creditor, was not responsible for the unauthorized acts of the keeper who had been placed in charge by the sheriff. And, lastly, that there is no competent evidence to support the finding of the court that appellant and defendant Brown conspired together nor is there any competent evidence of a direct participation by appellant in the operation of the mill or the sale of lumber by Brown.

It is the contention of appellant that the provisions of section 689 of the Code of Civil Procedure with respect to the written demand by the sheriff for a bond, which section in part reads as follows:

*"If personal property levied on is claimed by a third person . . . , the officer making the levy . . . must release the property unless the plaintiff, or the person in whose favor the writ runs, within five days after written demand by such officer, gives such officer an undertaking. . . ."* (Italics ours.) are solely for the benefit of the attaching creditor, and therefore may be waived by virtue of the terms of section 3513 of the Civil Code. Respondent denies that such is the case, but rather that the provisions of said section are for the benefit of the sheriff, and therefore could not be waived by the appellant.

Further answering appellant, respondent suggests that if Rupley is correct in his first contention then many inequitable situations would invariably result, and by way of illustration in his brief cites what he terms "Legal Larceny."

"A may attach a horse of B, and C might then file a third party claim, whereupon, by connivance between A and C, A refuses to file an undertaking, and if the horse were not returned to B, he, under the law, receives no notice of the third party claim, C would be given the horse and ride contentedly off the property of B, who has never had an opportunity to protect his rights."

He further maintains that such could not be the law, yet, if the contention of appellant were carried to the ultimate, that such inequitable situations would be the inevitable consequences.

It is respondent's further answer to appellant's suggested construction that although section 689.5 of the Code of Civil Procedure, which reads as follows:

*"Whenever,* under Section 689 of this code a third party claim has been filed as to property levied on and *the plaintiff*

*has failed to furnish or maintain a sufficient undertaking* to authorize the levying officer to continue *to hold the property and such officer is unable to find the defendant to deliver the property, the levying officer shall notify the defendant in writing at his last known address,* and if within 10 days thereafter the levying officer is unable to locate the defendant he may return the property to the party filing the third party claim.'' (Italics ours.)

was not enacted until 1941 and subsequent to the present action, that nevertheless its enactment was but the codification of the general rule which has been followed elsewhere. That while there is little assistance to be derived from the decisions in this state, nevertheless, such general rule being the accepted practice in other jurisdictions, and now having received sanction by the Legislature, it should be determinative of the question raised by respondent, and that therefore the defendant had a definite right to the property as well as notice of the result of proceedings taken in regard thereto.

It is true that other tribunals, although a third party claim was not involved, have enunciated the rule:

''That the attaching creditor may himself abandon the levy; but clearly there is nothing to prevent him doing so. However, it is equally clear that if he abandons the attached property and intends that the Sheriff shall return it to the possession of the owner, he cannot relieve himself of liability accruing thereafter until he notifies the owner of the abandonment and offers to restore it in substantially the condition existing' at the time of seizure. . . .

''It is clear that after the attachment . . . the owners refrained from exercising dominion over it. They were deprived of the use . . . and, until by actual notice they were informed of the cancellation, they had a right to assume the Sheriff still exercised dominion over the crop.'' (*Kelly* v. *Stockgrowers Credit Corporation,* 66 N.D. 209 [263 N.W. 717, 719, 103 A.L.R. 460].) As was also stated in *Mosley* v. *Black,* (Tex.Civ.App.) 110 S.W.2d 611, 613:

''If the attachment is abandoned and dismissed, the plaintiff cannot escape liability except by restoring the property to its rightful owner, and, if he fails to do this, he is liable to the owner for any damages that may accrue by virtue of his failure to do so.''

Neither sections 689 or 689.5 of the Code of Civil Pro-

cedure contain a provision as regards instructions to the sheriff under such circumstances, but section 4166 of the Political Code does, and under the latter section it has been held that plaintiff's instructions to the sheriff must be in writing and that evidence of parol authorization is inadmissible. (*Sanford v. Boring*, 12 Cal. 539; *Robinson v. Baker*, 35 Cal.App. 318 [169 P. 694].)

Respondent then contends that it therefore becomes reasonable to assume in light of the foregoing, that Rupley's attachment remained in force and effect and that such was the case at the time of the fire.

■ Even if the court erred in finding that there was no abandonment of the attachment by Rupley, because of the lack of a written demand for a bond, it would not constitute reversible error. The appellant could not be prejudiced if the trial court, by its finding, afforded him the benefit of considering that he participated in the disposition of the property under the mistaken view that he had a right so to do by reason of his attachment, rather than that he was a wilful tort feasor acting without any color or claim of right.

■ We find no merit in the second question raised by appellant. That is, the extent of liability of an attaching creditor for acts of the sheriff or keeper. The judgment of the trial court is in no way predicated upon the theory of *respondeat superior.*

It would seem to be entirely immaterial on what grounds Rupley or Brown purported to be acting, if they in fact tortiously appropriated and disposed of the property of Tuman. The trial court found on what it undoubtedly considered as ample evidence that the defendants did convert the plaintiff's property to their own use. Therefore it would be of no consequence whether such acts were committed as attaching creditors, third party claimants or in their individual capacities. ■ The only question to be determined is the one contained in appellant's last contention, was there sufficient evidence to support the court's finding of a conspiracy on the part of Brown and Rupley, and was there sufficient evidence to connect appellant in the operation of the mill?

Therefore, by reason of the disposition that is made of this final contention of appellant there is no need to determine in this record the other questions raised by appellant.

By reason of the voluminous testimony no useful purpose

would be served by an extended review. Suffice it to mention portions of the testimony of the defendants and two disinterested witnesses.

The defendant Brown, when called under section 2055 of the Code of Civil Procedure, admitted the agreement with Rupley to convert the plaintiff's property to their use and their actual participation in the operation of the mill and the sale of the lumber.

"Q. Who got the money for the church lumber? . . .

A. I don't remember that——

Q. Who got the money for that?

A. I collected it and then turned it over to Mr. Rupley, his part of it at twelve dollars a thousand, and I kept the balance.

Q. What was the twelve dollars a thousand for?

A. That was by an agreement with Mr. Rupley for the lumber in the yard.·

Q. That that lumber came from the lumber that the sheriff had attached? A. Yes.

Q. The sheriff at no time told you to let Mr. Rupley have this lumber, did he? A. No, he did not.

Q. The sheriff at no time told you to operate the planing mill or told you you could have the planing mill to operate?

A. I never asked the sheriff about it.

Q. He never told you to go ahead and operate it? A. No. Brown further testified:

Q. Now, Ed. Tuman never authorized you to go into possession of that mill, did he? A. No."

The appellant Rupley, himself, although a rather evasive witness, testified in answer to questions pertaining to his agreement with Brown concerning the sale of the lumber as follows:

"Q. Then if the lumber was sold, it was with your consent?

A. Well, it probably was. . . .

Q. Did you ever have any of your lumber manufactured through the Ed. Tuman mill?

A. Yes, they surfaced lumber for me several times.

Q. After the attachment was filed . . . ?

A. I think so."

Wm. L. Tatum, a trucking operator, residing in Sacramento, testified:

"I was here visiting with Mr. Brown . . . and Mr. Rupley came in during our visit. . . . During the conversation I asked them if they were operating the mill; they said they had been. That the fire was quite a loss to Mr. Rupley. They talked as 'we'."

Mr. Jess Gage, a lumber broker in Sacramento, testified in part as follows:

"Q. You sold some (lumber) prior to the fire?

A. I sold some for Mr. Tuman.

Q. And after the fire, did you sell some? A. I did.

Q. And who was paid for the lumber? A. Mr. Rupley.

Q. How did you happen to sell that lumber?

A. Mr. Rupley asked me to dispose of it.

Q. And he told you who it belonged to?

A. The supposition was that it was his.

Q. Did he say anything about it?

A. Yes, sir, he said he had some box lumber and wanted me to sell it.

Q. Did you ever have any conversation with Mr. Brown or Mr. Rupley in the office at the mill and before the fire?

A. I have talked to them a great many times up there.

Q. Did either of them ever discuss their operation of the planing mill with you? A. Yes, sir.

Q. Both Mr. Brown and Mr. Rupley? A. Yes.

Q. What did they say about that?

A. Mr. Rupley asked me sometime in 1939 if I would sell finished products that came out of the mill.

Q. About when was this conversation to the best of your recollection?

A. I would say it was possibly in June.

Q. And who was present?

A. No one present but Mr. Rupley and I. Mr. Rupley stated he was running the Plum Creek Mill, and he was going to move his mill down there and sell it, and wanted to know if I could sell his lumber?

Q. Did you have a talk with Mr. Brown? A. Yes, sir.

Q. About when?

A. I would say it was sometime prior to the fire. . . . At that time Mr. Brown told me he and Mr. Rupley were going to operate the mill that summer and in the fall were going

to move the plant down to Mr. Rupley's place here in the flat and operate from that locality.

Q. Did Mr. Rupley ever say anything about Mr. Brown operating the mill with him?

A. They both told me they were in partners and were going to operate it together.''

Further excerpts from the testimony might be quoted but such additional quotations would serve no useful purpose.

The trial court, at the conclusion of the hearing, made extensive findings to the effect that the equipment in the mill had been purchased by Edward, and that such contract had been fully performed by him with all payments having been made; that Tuman had paid in full all the rentals for the use of the premises; that no breach of the contract had been made by Tuman; that Tuman owned certain lumber on the premises; that the failure to post bond by Rupley did not release his attachment, nor did such failure give Rupley or Brown the right to operate the mill or sell the lumber; that the failure to give notice to Tuman of the purported release or abandonment of his attachment was deliberate and with the intent to conspire with Brown to exercise dominion over the attached property; that Brown's third party claim was invalid; that Brown continued in possession and conspired with Rupley to operate the mill, and actually did so; that such actions on the part of the defendants were without Edward's consent, and without any right whatsoever; and lastly, that by their negligent operation of the mill it was consumed by fire.

It is apparent from a review of the record that the findings of the trial court were amply justified. ■ ''In an action for damages resulting from acts of conspirators, the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.'' (5 Cal.Jur. 530.) It therefore logically follows that the plaintiff is entitled to a joint recovery of damages against such defendants as he can show have united or cooperated in inflicting a wrong upon him. (*Revert v. Hesse,* 184 Cal. 295 [193 P. 943].)

Oftentimes there is an intrinsic difficulty in proving a conspiracy, and therefore it has been held that a conspiracy may

sometimes be inferred from the nature of the acts done and the relation of the parties, the interests of the alleged conspirators, and other circumstances. (*Revert* v. *Hesse, supra.*)

Here, however, we are presented with direct facts, concerning the relations, circumstances and interests of the conspirators. In other words substantial evidence was introduced to prove every material fact necessary to sustain plaintiff's allegations of conspiracy on the part of the defendants. At best, all that can be said as regards the testimony produced on behalf of the defendants, is that it accomplished nothing more than to present a conflict in the evidence to the trial court. No complaint has been made of the award by the court and therefore it must be taken as correct. The principle that the trial court is the sole judge of the weight and sufficiency of the evidence is too well settled to warrant repetition. (*Norgard* v. *Estate of Norgard,* 54 Cal.App.2d 82 [128 P.2d 566].) It is self-evident that the court determined such conflicts in favor of the respondent Tuman and against the defendants Brown and Rupley. It hardly would be possible to find a case more conflicting in its testimony than the present one. Particularly with so many varied and different interests consolidated in the one trial. It necessarily follows that if the rule above stated is to have any degree of efficacy in its application then no better instance could be found than the present for the court so to hold.

The judgment is affirmed.

Adams, P. J., and Thompson, J., concurred.